# 23-6321

*To Be Argued By*:
CECILIA VOGEL

## United States Court of Appeals

### For the Second Circuit

———◆◆———

UNITED STATES OF AMERICA,

*Appellee*,

—against—

DJONIBEK RAHMANKULOV, also known as Sealed Defendant 1,

*Defendant-Appellant*,

SHERZOD RASULOV, also known as Sealed Defendant 1, ARTUR SATTAROV,
SHAKHZOD YUNUSOV, SUKHROB SOBIROV, also known as Sealed Defendant 1,
FARIDDUN KULIEV, JASUR RAHMATOV,

*Defendants*.

—————————

**On Appeal From The United States District Court
For The Southern District of New York**

## BRIEF FOR THE UNITED STATES OF AMERICA

MATTHEW PODOLSKY
*Acting United States Attorney for the
Southern District of New York,
Attorney for the United States
    of America*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212)

NATHAN REHN,
CECILIA VOGEL
JAMES LIGTENBERG
    *Assistant United States Attorneys,
    Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.   The Government's Case . . . . . . . . . . . . . . . .  2

        1.   Rahmankulov's Scheme to Launder the
            Proceeds of Computer Hacking . . . . . . .  3

        2.   Rahmankulov's Schemes to Launder the
            Proceeds of Healthcare Fraud and Wire
            Fraud and to Operate an Unlicensed
            Money Transmitting Business . . . . . . .  6

        3.   Rahmankulov's SBA Fraud . . . . . . . . . .  8

    B.   The Defense Case, Verdict, and
        Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

ARGUMENT:

POINT I—The Jury Instructions Did Not
    Constructively Amend the Indictment . . . . . . . .  9

    A.   Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . .  9

    B.   Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  12

        1.   Constructive Amendment . . . . . . . . . .  12

        2.   Standard of Review . . . . . . . . . . . . . . .  13

    C.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

ii

PAGE

POINT II—Rahmankulov Did Not Receive Ineffective
Assistance of Counsel . . . . . . . . . . . . . . . . . . . . .  21

   A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  21

   B.  Applicable Law . . . . . . . . . . . . . . . . . . . . .  25

      1.  Ineffective Assistance of Counsel . . . .  25

      2.  Ineffective Assistance Claims on Direct
Appeal . . . . . . . . . . . . . . . . . . . . . . . . . .  27

   C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  29

      1.  Rahmankulov Has Failed to Demonstrate
Ineffective Assistance in His Trial
Counsel's Closing Argument . . . . . . . .  29

      2.  Rahmankulov Has Failed to Demonstrate
Ineffective Assistance in His Trial
Counsel's Decision Not to Challenge the
Jury Instructions . . . . . . . . . . . . . . . . . .  36

POINT III—The District Court Did Not Err in
Determining the Loss Amount . . . . . . . . . . . . .  37

   A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  37

   B.  Applicable Law . . . . . . . . . . . . . . . . . . . . .  40

      1.  Standard of Review . . . . . . . . . . . . . . .  40

      2.  Loss Amount . . . . . . . . . . . . . . . . . . . . .  41

   C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  42

iii

PAGE

1.  Rahmankulov Was Appropriately Held Responsible for Money Laundered by Co-Conspirators . . . . . . . . . . . . . . . . . . . . .  42

2.  The District Court Correctly Included Intended Loss in the Guidelines Calculation . . . . . . . . . . . . . . . . . . . . .  45

3.  Any Error in the Guidelines Calculation Was Harmless . . . . . . . . . . . . . . . . . . .  47

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

## TABLE OF AUTHORITIES

*Cases*:

*Bennett v. United States*,
    663 F.3d 71 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . 25

*Bloomer v. United States*,
    162 F.3d 187 (2d Cir. 1998) . . . . . . . . . . . . . . . . 29

*Cox v. Donnelly*,
    387 F.3d 193 (2d Cir. 2004) . . . . . . . . . . . . . . . . 29

*Gall v. United States*,
    552 U.S. 38 (2007). . . . . . . . . . . . . . . . . . . . . . . . 40

*Greiner v. Wells*,
    417 F.3d 305 (2d Cir. 2005) . . . . . . . . . . . . . . . . 35

*Harrington v. Richter*,
    562 U.S. 86 (2011). . . . . . . . . . . . . . . . . . . . . . 27, 33

iv

PAGE

*Hedgpeth v. Pulido*,
555 U.S. 57 (2008) . . . . . . . . . . . . . . . . . . . . . . . . 18

*Kisor v. Wilkie*,
588 U.S. 558 (2019) . . . . . . . . . . . . . . . . . . . . . . . 45

*Lindstadt v. Keane*,
239 F.3d 191 (2d Cir. 2001) . . . . . . . . . . . . . . . 31

*Loughrin v. United States*,
573 U.S. 351 (2014) . . . . . . . . . . . . . . . . . . . . . . . 17

*Massaro v. United States*,
538 U.S. 500 (2003) . . . . . . . . . . . . . . . . . 27, 28, 36

*Neder v. United States*,
527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Puckett v. United States*,
556 U.S. 129 (2009) . . . . . . . . . . . . . . . . . . . . . . . 14

*Sales v. Harris*,
675 F.2d 532 (2d Cir. 1982) . . . . . . . . . . . . . . . 33

*Shannon v. United States*,
512 U.S. 573 (1994) . . . . . . . . . . . . . . . . . . . . . . . 35

*Sparman v. Edwards*,
154 F.3d 51 (2d Cir. 1998) . . . . . . . . . . . . . . 29, 36

*Stinson v. United States*,
508 U.S. 36 (1993) . . . . . . . . . . . . . . . . . . . . . . . . 45

*Stirone v. United States*,
361 U.S. 212 (1960) . . . . . . . . . . . . . . . . . . . . . . . 14

*Strickland v. Washington*,
466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . *passim*

v

PAGE

*Tippins v. Walker*,
    77 F.3d 682 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . 27

*United States v. Acevedo*,
    229 F.3d 350 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 33

*United States v. Aguirre*,
    912 F.2d 555 (2d Cir. 1990) . . . . . . . . . . . . . 26, 31

*United States v. Atilla*,
    966 F.3d 118 (2d Cir. 2020) . . . . . . . . . . . . . . . . . 19

*United States v. Bastian*,
    770 F.3d 212 (2d Cir. 2014) . . . . . . . . . .  13, 14, 20

*United States v. Ben Zvi*,
    242 F.3d 89 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . 35

*United States v. Birkin*,
    366 F.3d 95 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . 35

*United States v. Capers*,
    20 F.4th 105 (2d Cir. 2021) . . . . . . . . . . . . . . . . . 20

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008) (en banc) . . . . . . . . . 40

*United States v. Cotton*,
    535 U.S. 625 (2002). . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Cramer*,
    777 F.3d 597 (2d Cir. 2015) . . . . . . . . . . . . . . . . . 40

*United States v. Cronic*,
    466 U.S. 648 (1984). . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. D'Amelio*,
    683 F.3d 412 (2d Cir. 2012) . . . . . . .  12, 13, 15, 16

vi

PAGE

*United States v. Danielson,*
    199 F.3d 666 (2d Cir. 1999) . . . . . . . . . . . . . . . . 13

*United States v. De La Pava,*
    268 F.3d 157 (2d Cir. 2001) . . . . . . . . . . . . . . . . 29

*United States v. Delarosa,*
    675 F. App'x 91 (2d Cir. 2017) . . . . . . . . . . . . . . 48

*United States v. Dove,*
    884 F.3d 138 (2d Cir. 2018) . . . . . . . . . . . . . . . . 12

*United States v. Dussard,*
    967 F.3d 149 (2d Cir. 2020) . . . . . . . . . . . . . . . . 14

*United States v. Eisner,*
    431 F. App'x 23 (2d Cir. 2011) . . . . . . . . . . . . . . 44

*United States v. Ferguson,*
    676 F.3d 260 (2d Cir. 2011) . . . . . . . . . . . . . 18, 35

*United States v. Fleurimont,*
    401 F. App'x 580 (2d Cir. 2010) . . . . . . . . . . . . . 29

*United States v. Ford,*
    435 F.3d 204 (2d Cir. 2006) . . . . . . . . . . . . . 17, 18

*United States v. Frady,*
    456 U.S. 152 (1982). . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Gaskin,*
    364 F.3d 438 (2d Cir. 2004) . . . . . . . . . . . . . 26, 29

*United States v. Guang,*
    511 F.3d 110 (2d Cir. 2007) . . . . . . . . . . . . . . . . 31

*United States v. Heimann,*
    705 F.2d 662 (2d Cir. 1983) . . . . . . . . . . . . . . . . 12

vii

PAGE

*United States v. Hertular,*
   562 F.3d 433 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 13

*United States v. Hon,*
   17 F.3d 21 (2d Cir. 1994) . . . . . . . . . . . . . . . . 30, 31

*United States v. Jass,*
   569 F.3d 47 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 48

*United States v. Kent,*
   821 F.3d 362 (2d Cir. 2016) . . . . . . . . . . . . . . . . 49

*United States v. Khalupsy,*
   5 F.4th 279 (2d Cir. 2021) . . . . . . . . . . . . . . . . . 20

*United States v. Khedr,*
   343 F.3d 96 (2d Cir. 2003) . . . . . . . . . . . 28, 29, 36

*United States v. Komar,*
   529 F. App'x 28 (2d Cir. 2013) . . . . . . . . . . . . . . 49

*United States v. Marcus,*
   560 U.S. 258 (2010). . . . . . . . . . . . . . . . . . . . 14, 21

*United States v. Moore,*
   975 F.3d 84 (2d Cir. 2020) . . . . . . . . . . . . . . . . . 14

*United States v. Morris,*
   350 F.3d 32 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 27

*United States v. Pasternak,*
   No. 23-6316, 2024 WL 4763986 (2d Cir. Nov. 13,
   2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Patino,*
   962 F.2d 263 (2d Cir. 1992) . . . . . . . . . . . . . . . . 20

viii

PAGE

*United States v. Peguero*,
   34 F.4th 143 (2d Cir. 2022) . . . . . . . . . . . . . . . . . 46

*United States v. Rainford*,
   110 F.4th 455 (2d Cir. 2024) . . . . . . . . .   42, 45, 46

*United States v. Reiter*,
   897 F.2d 639 (2d Cir. 1990) . . . . . . . . . . . . . . . . . 32

*United States v. Rigas*,
   490 F.3d 208 (2d Cir. 2007) . . . . . . . . . . . . . 12, 16

*United States v. Salmonese*,
   352 F.3d 608 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 12

*United States v. Shuster*,
   331 F.3d 294 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 40

*United States v. Skelly*,
   442 F.3d 94 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . 19

*United States v. Smith*,
   No. 22-3104, 2024 WL 4404046 (2d Cir. Oct. 4,
   2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Studley*,
   47 F.3d 569 (2d Cir. 1995) . . . . . . . . . . . . . . 41, 42

*United States v. Vilar*,
   729 F.3d 62 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . 13

*United States v. Villafuerte*,
   502 F.3d 204 (2d Cir. 2007) . . . . . . . . . . . . . . . . . 14

*United States v. Weiss*,
   930 F.2d 185 (2d Cir. 1991) . . . . . . . . . . . . . . . . . 33

ix

PAGE

*United States v. Whab,*
    355 F.3d 155 (2d Cir. 2004) . . . . . . . . . . . . . . 14, 20

*United States v. Young,*
    745 F.2d 733 (2d Cir. 1984) . . . . . . . . . . . . . . . . . 13

*United States v. Zheng,*
    113 F.4th 280 (2d Cir. 2024) . . . . . . . . . . . . . . . . 46

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 1344 . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . 38, 39, 47, 48

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . 21, 27, 36

Fed. R. Crim. P. 7(c)(1) . . . . . . . . . . . . . . . . . . . . . . . 17

U.S.S.G. § 1B1.3 . . . . . . . . . . . . . . . . . . . . . . 41, 42, 44

U.S.S.G. § 2B1.1 . . . . . . . . . . . . . . . . . . . . . . 42, 45, 46

U.S.S.G. § 4B1.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket No. 23-6321

———————————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

DJONIBEK RAHMANKULOV, also known as Sealed
Defendant 1,

*Defendant-Appellant,*

SHERZOD RASULOV, also known as Sealed Defendant
1, ARTUR SATTAROV, SHAKHZOD YUNUSOV, SUKHROB
SOBIROV, also known as Sealed Defendant 1,
FARIDDUN KULIEV, JASUR RAHMATOV,

*Defendants.*

———————————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————————

### Preliminary Statement

Djonibek Rahmankulov appeals from a judgment of
conviction entered on March 20, 2023, in the United
States District Court for the Southern District of New
York, following a two-week trial before the Honorable

2

Ronnie Abrams, United States District Judge, and a jury.

Superseding Indictment S4 20 Cr. 653 (RA) (the "Indictment") was filed on June 2, 2022, in six counts, three of which charged Rahmankulov. Count One charged Rahmankulov with conspiracy to operate an unlicensed money transmitting business, in violation of 18 U.S.C. § 371. Count Two charged Rahmankulov with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). Count Four charged Rahmankulov with bank fraud, in violation of 18 U.S.C. §§ 1344 and 2.

Trial commenced on August 22, 2022 and ended on September 1, 2022, when Rahmankulov was convicted on all three counts.

On March 17, 2023, Judge Abrams sentenced Rahmankulov principally to a term of 121 months' imprisonment, to be followed by three years' supervised release, and imposed a $300 mandatory special assessment.

Rahmankulov is serving his sentence.

### Statement of Facts

### A. The Government's Case

The evidence at trial overwhelmingly showed that, from late 2017 to 2020, Rahmankulov operated a New York City-based money laundering network that laundered the proceeds of computer hacking, healthcare fraud, and fraudulent Small Business Administration ("SBA") loans. Rahmankulov also ran an unlicensed

3

money transmitting business that transferred funds outside of the regulated financial system—in exchange for a fee—primarily between the United States and Uzbekistan and Iran. The evidence at trial further demonstrated that Rahmankulov committed bank fraud by repeatedly lying to banks in order to open and operate bank accounts for shell companies he used in his money laundering and unlicensed money transmitting schemes.

## 1. Rahmankulov's Scheme to Launder the Proceeds of Computer Hacking

In late 2017 or early 2018, Rahmankulov was invited by a co-conspirator—Anashon Kamalov—to participate in an ongoing money laundering operation. Rahmankulov had previously participated in a credit card hacking scheme with Kamalov. (Tr. 179-80).[1] Kamalov explained to Rahmankulov that he was in touch with a "big group of hackers" located abroad, who would wire funds into a bank account set up by

---

[1]  "Tr." refers to the trial transcript; "GX" refers to a Government exhibit at trial; "PSR" refers to the Presentence Report prepared by the Probation Office in connection with Rahmankulov's sentencing; "Br." refers to Rahmankulov's brief on appeal; "A." refers to the appendix filed with that brief; "Dkt." refers to an entry on the District Court's docket for this case; and "Sent. Tr." refers to the transcript of the sentencing hearing (*see* Dkt. 237). Unless otherwise noted, case text quotations omit internal quotation marks, citations, footnotes, and previous alterations.

4

Rahmankulov. (Tr. 192). Rahmankulov provided a corporate bank account to Kamalov in the name of a shell company, Jasmina Transport, to launder the funds stolen from the computer hacking. (Tr. 188-89). Rahmankulov had opened the Jasmina Transport bank account in October 2017 and falsely informed the bank that Jasmina Transport was a freight trucking company. (GX 3001, 3801).

In February and March 2018, Rahmankulov's Jasmina Transport bank account received wire transfers from Paul Greco and May Supply Company totaling more than $180,000. (GX 3003-A, 3001). Paul Greco and an employee of May Supply Company testified at trial that funds had been stolen from their bank accounts during a computer hack. (Tr. 63, 72-74). Bank records and video surveillance showed that, soon after receiving each transfer, Rahmankulov personally withdrew the hacking proceeds in cash. (Tr. 94-101; GX 3001). A bank investigator testified at trial that she contacted Rahmankulov after these transactions to question him about the transfer from Paul Greco, and that Rahmankulov falsely claimed the payment was from "his friend Jack" in exchange for a truck. (Tr. 270-71). After Rahmankulov failed to provide the bank investigator with documentation for the purported truck sale, the bank froze Rahmankulov's accounts and barred him from banking at that bank. (Tr. 270-74).

Kamalov testified that, after this first laundering transaction involving Jasmina Transport, Rahmankulov cut Kamalov out of the money laundering scheme and began working directly with the computer hacker.

5

(Tr. 200-02, 207-08, 340, 349-51, 353-54; GX 2701-A, 2701-A_T, 3901, 3901-A_T). Because Rahmankulov could no longer use bank accounts in his own name after the bank had blocked him, Rahmankulov recruited others into the scheme to open sham bank accounts and receive hacking funds on his behalf. Two of Rahmankulov's friends testified at trial that Rahmankulov recruited them to create sham trucking companies and to lie to banks to open accounts for those companies—accounts Rahmankulov could use to receive and withdraw money. (Tr. 306-09, 311-35, 472-92). Bank records, testimony from the employees of four additional companies that were victimized by the hacking scheme, and testimony from Rahmankulov's two friends showed that, over several months in 2018, these bank accounts received hundreds of thousands of dollars in funds stolen from the victims' bank accounts during computer hacks. (Tr. 118-53, 247-57, 283-90, 314-35, 418-26, 482-92; GX 602-C, 608-02-B, 701, 701-01, 702-01-C, 702-04, 702-05, 703-02-F, 703-03, 901, 907, 1301, 1302, 1702, 3003-B, 3003-C, 3003-D, 3603, 3717). Each time hacking proceeds were transferred into these accounts, Rahmankulov quickly withdrew the proceeds as cash or transferred them to bank accounts in his or his family members' names. (Tr. 1017-29; GX 3003-A, 3003-B, 3003-C, 3003-D).

At one point, Rahmankulov recorded a cellphone video of himself counting stacks of cash that he was laundering, then sent the video to the overseas hacker. (GX 3901-A, 3901-A_T; Tr. 183-85, 207-10, 353-55). Rahmankulov also told one of the friends he had recruited into the scheme that the "hacker is more important to me, he's closer to me than my mother and

6

father, I'm going to make a lot of moneys for this hacker, I'm going to become a rich man through him." (Tr. 340). Rahmankulov used his earnings from the money laundering scheme to engage in lavish spending in New York and to buy "a couple of cars, a house, and [an] apartment" in Uzbekistan. (Tr. 352-53).

Rahmankulov also instructed another friend he had recruited into the scheme to lie to law enforcement about a particular monetary transaction. (Tr. 505-06). When Rahmankulov learned that his friend had told law enforcement the truth about the transaction and that Rahmankulov might go to jail, he told the friend: "I will drag all of you with me, and once you are there, then I will have my revenge." (Tr. 510). Rahmankulov also threatened to blackmail his friend by saying bad things about him and disclosing his "secrets" to his parents. (Tr. 510).

### 2. Rahmankulov's Schemes to Launder the Proceeds of Healthcare Fraud and Wire Fraud and to Operate an Unlicensed Money Transmitting Business

In early 2020, Rahmankulov began using his network of sham companies to launder the proceeds of healthcare and wire fraud and to operate an unlicensed money transmitting business.

During this scheme, Rahmankulov laundered millions of dollars in criminal proceeds for pharmacies that fraudulently billed Medicare and Medicaid. To launder these funds, Rahmankulov opened multiple bank accounts in the names of shell companies that he falsely claimed were engaged in trucking and selling

7

electronics, watches, and office supplies. (Tr. 1029-39; GX 3001, 3005-A, 3005-B, 3005-C, 3005-D, 3801). Numerous pharmacies then gave Rahmankalov checks to deposit into his bank accounts. Those checks represented the proceeds of a scheme in which the pharmacies fraudulently overbilled Medicare and Medicaid for HIV medications. The pharmacies carried out the scheme by (1) buying back HIV medications from Medicare and Medicaid patients and then reselling the same medications; and (2) purchasing counterfeit medications from unregulated wholesalers. (Tr. 968-70, 988-89, 999-1000; GX 3002).

While he was laundering healthcare fraud proceeds, Rahmankulov also operated an unlicensed money transmitting business that primarily transferred funds between the United States and Uzbekistan and Iran. Rahmankulov combined the money laundering and unlicensed money transmitting schemes to execute financial transactions. As two cooperating witnesses explained, the participants in the laundering scheme received checks from the pharmacies that were engaged in fraud; in exchange, they provided the pharmacy owners with cash collected from members of the Uzbek community in New York who wanted to send remittances to Uzbekistan outside the regulated financial system. (Tr. 799-806, 869-79). The participants in the laundering scheme then used the pharmacy check deposits to operate an unlicensed money transmitting business by transferring funds to Iranian-Americans and Uzbeks in Uzbekistan via Chinese companies. (Tr. 799-806, 869-79). Several Iranian-Americans testified about receiving funds from relatives in Iran via wire transfers from

8

Rahmankulov's shell company accounts, despite not knowing who Rahmankulov was. (Tr. 601-21). In addition, a co-conspirator testified about receiving multiple check deposits from Rahmankulov's companies and getting directions from another co-conspirator to wire the funds overseas to Chinese companies. (Tr. 705-06, 709-10, 719-27, 730-37; GX 1103-B).

### 3. Rahmankulov's SBA Fraud

Rahmankulov also participated in a scheme to defraud the SBA. In 2020, during the COVID-19 pandemic, the SBA offered economic injury disaster loans to affected small businesses. (Tr. 428). The purpose of the program was to "provide working capital for businesses to pay their obligations" in the midst of the pandemic. (Tr. 430). In order to calculate the eligible loan amount, the SBA required applicants to provide information about business revenue and related data. (Tr. 431-32). Rahmankulov filed at least seven false applications on behalf of shell companies he controlled. (GX 2908). Based on these false applications, the SBA sent more than $154,000 to accounts controlled by Rahmankulov, who then commingled the proceeds with funds from his other money laundering schemes. (GX 3009-A, 3009-B; Tr. 1087-88).

## B. The Defense Case, Verdict, and Sentencing

The defense did not call any witnesses. In cross-examination of the Government's witnesses and argument to the jury, the defense claimed that Rahmankulov was engaged in legitimate business transactions and did not know the illegal source of the funds.

9

On September 1, 2022, the jury found Rahmankulov guilty on all three counts. On March 17, 2023, the District Court sentenced Rahmankulov principally to a term of 121 months' imprisonment, to be followed by three years' supervised release. (Dkt. 236).

# A R G U M E N T

## POINT I

### The Jury Instructions Did Not Constructively Amend the Indictment

Rahmankulov argues—for the first time on appeal —that the trial evidence and the jury instructions constructively amended Count Four of the Indictment. (Br. 19-31). But there was no constructive amendment, let alone one that rises to the level of plain error.

## A. Relevant Facts

Count Four of the Indictment charged that Rahmankulov committed bank fraud in violation of 18 U.S.C. § 1344. (A. 32). Section 1344 has two prongs, under which a defendant can be convicted for executing either a scheme "to defraud a financial institution," 18 U.S.C. § 1344(1), or a scheme "to obtain any of the money, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution," 18 U.S.C. § 1344(2).

The Indictment alleged that Rahmankulov:

> did knowingly execute and attempt to execute a scheme and artifice to obtain

> moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution, . . . by means of false and fraudulent pretenses, representations, and promises, to wit, Rahmankulov knowingly made, and aided and abetted the making of, material misrepresentations to a federally insured financial institution and others in order to deceive that financial institution into allowing companies operated by Rahmankulov to operate and process financial transactions through the institution, . . . and in doing so obtained and attempted to obtain moneys, funds, and property owned by and under the custody and control of such financial institution.

(A. 32).

Prior to trial, the Government submitted a request to charge that included both prongs of 18 U.S.C. § 1344. The Government's proposed charge stated, in relevant part, that the first element of bank fraud was "a scheme to defraud a bank or credit union *or* a scheme to obtain money owned by or under the custody or control of a bank or credit union," and that proof of this element "requires proof of the existence of only one of these." (A. 77). The Government's request to charge explained that the first prong, a "scheme to defraud," required proof of "a pattern or course of conduct concerning a material matter designed to deceive a federally insured bank or credit union into releasing

11

property." (A. 77). The Government's charge defined the second prong of bank fraud as requiring proof of "a scheme to obtain money or property owned by or under the custody and control of a bank or credit union by means of false or fraudulent pretenses, representations or promises." (A. 78).

Rahmankulov subsequently submitted his own request to charge, in which he asked for the same instruction for bank fraud that was contained in the Government's request to charge. (Dkt. 162 at 29). During trial, Judge Abrams distributed a charge containing essentially the same language that both parties had requested and conducted a charge conference at which Rahmankulov raised no objection to this language. (Tr. 1072). Judge Abrams then instructed the jury using the charge as requested by the parties: that the first element of bank fraud required proof of "a scheme or artifice to defraud a bank or a scheme to obtain money owned by or under the custody or control of a bank by means of false or fraudulent pretenses, representations, or promises." (A. 72). With respect to the first prong, Judge Abrams instructed the jury that a scheme to defraud required proof of "a pattern or course of conduct concerning a material matter designed to deceive a federally insured bank into releasing property." (A. 73). With respect to the second prong, Judge Abrams instructed the jury that it required proof of "a scheme to obtain money or property owned by or under the custody and control of a bank by means of false or fraudulent pretenses, representations, or promises." (A. 73).

12

## B. Applicable Law

### 1. Constructive Amendment

"A constructive amendment occurs when the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted." *United States v. Dove*, 884 F.3d 138, 146 (2d Cir. 2018). A defendant raising a constructive-amendment claim "must demonstrate that the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify *essential elements* of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012). The prohibition against constructive amendments rests upon two concerns: that the indictment "fairly informs a defendant of the charge against which he must defend," and that it "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007).

Because "proof at trial need not, indeed cannot, be a precise replica of the charges contained in an indictment," *United States v. Heimann*, 705 F.2d 662, 666 (2d Cir. 1983), it is well-established that "not all modifications constitute constructive amendments," *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003). Rather, this Court has "consistently permitted significant flexibility in proof, provided that the defendant was given *notice* of the *core of criminality* to be proven at trial." *Rigas*, 490 F.3d at 228. "The 'core of

13

criminality' of an offense involves the essence of a crime, in general terms; the particulars of how a defendant effected the crime falls outside that purview." *D'Amelio*, 683 F.3d at 418; *see United States v. Vilar*, 729 F.3d 62, 91 (2d Cir. 2013). Thus, there is no constructive amendment where the indictment's allegations and the proof at trial both relate to a "single set of discrete facts," or form "part of a single course of conduct" with the same "ultimate purpose." *D'Amelio*, 683 F.3d at 419-21. In assessing whether or not a constructive amendment has occurred, "[t]he critical determination is whether the allegations and the proof substantially correspond." *United States v. Danielson*, 199 F.3d 666, 670 (2d Cir. 1999).

## 2. Standard of Review

A constructive-amendment claim raised for the first time on appeal is subject to plain-error review. *See United States v. Bastian*, 770 F.3d 212, 219 (2d Cir. 2014). Moreover—and significantly for purposes of the present appeal—"not even the plain error doctrine permits reversal on the ground that the trial court granted a defendant's request," because "an invited error generally does not require reversal." *United States v. Young*, 745 F.2d 733, 752 (2d Cir. 1984); *accord United States v. Hertular*, 562 F.3d 433, 444 (2d Cir. 2009). "[T]his Court has refused to reverse on the grounds of constructive amendment where, for example, the defendants themselves requested the court to issue instructions amending their indictments . . . ." *Bastian*, 770 F.3d at 218.

14

To show plain error, a defendant must establish that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010); *United States v. Moore*, 975 F.3d 84, 90 (2d Cir. 2020). "[R]eversal for plain error should 'be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.' " *United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007) (quoting *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982)); *see Puckett v. United States*, 556 U.S. 129, 135 (2009) ("Meeting all four prongs is difficult, as it should be."). The burden to establish plain error rests with the appellant. *United States v. Dussard*, 967 F.3d 149, 156 (2d Cir. 2020).

"For an error to be plain, it must, at a minimum, be clear under current law." *United States v. Whab*, 355 F.3d 155, 158 (2d Cir. 2004). This Court "typically will not find such error where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court." *Id.*

This Court has stated that "constructive amendments are *per se* prejudicial even in the context of plain error review, thus automatically satisfying the third prong" of the plain-error standard. *Bastian*, 770 F.3d at 220 n.4. That proposition stems from *Stirone v. United States*, which treated what was essentially a constructive amendment as a "fatal error" requiring reversal. 361 U.S. 212, 219 (1960). But that approach

15

has been undermined by subsequent Supreme Court decisions holding that constitutional errors, including indictment defects, are subject to harmless-error and plain-error review. *See, e.g.*, *United States v. Cotton*, 535 U.S. 625, 631 (2002) (indictment defects subject to plain-error review); *Neder v. United States*, 527 U.S. 1, 8 (1999) (failure to instruct the jury on an element of the crime subject to harmless-error analysis). In *D'Amelio*, this Court recognized that the "*per se*" approach is arguably inconsistent with subsequent Supreme Court case law, but declined to reach the issue because it held that there was no constructive amendment in that case. *D'Amelio*, 683 F.3d at 417 n.2.[2]

## C.  Discussion

Rahmankulov argues that the Indictment was constructively amended because the District Court instructed the jury that the first element of bank fraud was satisfied if it found either a scheme to defraud a bank or a scheme to obtain money in the custody of a bank, while the Indictment only specifically referenced the "scheme to obtain money" prong of the bank fraud statute. (Br. 20-28). That argument fails to make out a constructive amendment claim, however, because Rahmankulov does not engage with the relevant question for finding a constructive amendment: whether

---

[2]  Likewise, here—as discussed below—there is no need to resolve the question because no constructive amendment occurred, any error was invited by Rahmankulov, and Rahmankulov has not demonstrated the other elements of plain-error review.

16

"the defendant was given notice of the core of criminality to be proven at trial." *Rigas*, 490 F.3d at 228.

Rahmankulov does not even argue that he received inadequate notice of the nature of the charged criminal scheme. Nor could he, as the Indictment's description of the bank fraud scheme was entirely consistent with the scheme that was proven and argued at trial—namely, that the defendant "made, and aided and abetted the making of, material misrepresentations to a federally insured financial institution and others in order to deceive that financial institution into allowing companies operated by Rahmankulov to operate and process financial transactions through the institution." (A. 32; *see, e.g.*, Tr. 1169-71 (Government's closing argument discussing the defendant's false statements to banks to induce them to process financial transactions for his companies)). An indictment has not been constructively amended where the allegations in the indictment and the proof at trial both relate to a "single set of discrete facts," or form "part of a single course of conduct" with the same "ultimate purpose." *D'Amelio,* 683 F.3d at 419-21.

Rahmankulov attempts to avoid this straightforward principle by focusing on the fact that the jury instructions permitted the jury to convict on a finding of a "scheme to defraud" a bank, as set forth in 18 U.S.C. § 1344(1), whereas the Indictment only specifically quoted the "scheme to obtain money" language from 18 U.S.C. § 1344(2). (Br. 24-25). There are several flaws in that argument. First, the Indictment referenced 18 U.S.C. § 1344 in its entirety and described the scheme as involving "material misrepresentations to a

17

federally insured financial institution and others in or-
der to deceive that financial institution" into conduct-
ing financial transactions. (A. 32). That description
fairly describes a scheme to defraud a bank and there-
fore suffices as a "plain, concise, and definite written
statement of the essential facts constituting the of-
fense charged" under Section 1344(1) as well as Sec-
tion 1344(2). *See* Fed. R. Crim. P. 7(c)(1). It was thus
proper to instruct the jury on both prongs.

Second, even if Rahmankulov were correct that the
jury instructions went beyond what was alleged in the
Indictment, that still qualifies only as a variance as
long as he was on notice of the core of criminality with
which he was charged, as he plainly was. The mere fact
that Rahmankulov alleges an error in the jury instruc-
tions, as opposed to a variance in the proof at trial,
does not change the standard for identifying when a
constructive amendment has occurred. *See United
States v. Ford*, 435 F.3d 204, 216 (2d Cir. 2006) ("If the
defendant was given adequate notice of that core and
no substantial prejudice is shown, a challenged in-
struction will be deemed at most a harmless vari-
ance."). The purported variance at issue here is espe-
cially harmless because, on the facts of this case, the
only actual effect of including Section 1344(1) in the
jury instructions would be to *increase* the burden of
proof on the Government beyond what was needed to
prove the crime on a Section 1344(2) theory. While
Subsection (1) requires an intent "to defraud a finan-
cial institution," 18 U.S.C. § 1344(1), Subsection (2) re-
quires only an "intent to acquire bank property."
*Loughrin v. United States*, 573 U.S. 351, 363 n.6
(2014). And given the facts of this case and the

18

instructions that were given to the jury, there was no risk of the jury somehow convicting on the "scheme to defraud" theory but not also finding that Rahmankulov engaged in a scheme to obtain money from a bank. Specifically, the evidence showed that Rahmankulov did in fact obtain millions of dollars from the sham bank accounts he controlled, and Judge Abrams's instructions on the "scheme to defraud" prong required the jury to find a scheme "to deceive a federally insured bank into releasing property." (A. 73). In short, Rahmankulov had full notice of the nature of the crime with which he was charged, the proof at trial and the jury instructions were fully in line with the allegations in the Indictment, and any variance in the inclusion of the language of Section 1344(1) in the jury instructions was plainly harmless. *Ford*, 435 F.3d at 216.

Third, the real gravamen of Rahmankulov's claim is that the jury instructions provided an alternate ground for conviction—that the jury could convict if it found that Rahmankulov engaged in a "scheme to defraud" a bank—that was not specifically alleged in the Indictment. That claim has nothing do to with the notice concerns that animate the constructive-amendment doctrine. It is instead a challenge to a jury instruction on the ground that it provided alternative theories of conviction. However, such a challenge is subject to harmless error review. *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (per curiam) (when jury is instructed on multiple theories of liability, one of which is defective, a court must ascertain whether a flawed instruction had a "substantial and injurious effect in determining the jury's verdict"); *United States v. Ferguson*, 676 F.3d 260, 276-77 (2d Cir. 2011) (applying

19

*Hedgpeth* to hold that a jury verdict may not be reversed if "either: (1) the jury would have necessarily found the causation element satisfied beyond a reasonable doubt even with a proper instruction; or (2) the jury would have necessarily found the defendants guilty on one of the properly instructed theories of liability"). Here, Rahmankulov attempts to avoid harmless-error review by characterizing his argument as a constructive-amendment claim (Br. 30), because any attempt to show prejudice would plainly fail. The evidence overwhelmingly showed that Rahmankulov made material misrepresentations to obtain money in the custody of multiple banks by inducing them to process various transactions over the course of the scheme. (*See, e.g.*, Tr. 270-74, 306-09, 311-35, 472-92, 1029-39; GX 3001, 3005-A. 3005-B, 3005-C, 3005-D, 3801). Thus, the record establishes that the jury would have convicted even if only instructed on the language of Section 1344(2). *See, e.g.*, *United States v. Atilla*, 966 F.3d 118, 126-27 (2d Cir. 2020) (instructional error harmless where there was "little doubt" that jury found defendant "guilty on a different, properly instructed theory of liability"); *United States v. Skelly*, 442 F.3d 94, 99 (2d Cir. 2006) (no prejudice where the Government's "primary theory of liability" "was supported by overwhelming proof").

Finally, even if there were error, Rahmankulov's claim should be rejected under both the invited-error doctrine and the plain-error standard. Under the invited-error doctrine, because Rahmankulov himself requested the jury instruction that he now challenges on appeal (Dkt. 162 at 29), this Court should "refuse to

20

reverse on the grounds of constructive amendment," *Bastian*, 770 F.3d at 212.

And even apart from the invited-error doctrine, Rahmankulov cannot demonstrate plain error. An error is ordinarily not plain "where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court." *Whab,* 355 F.3d at 158. Here, Rahmankulov does not cite any case holding that the type of variance between the Indictment and the jury instructions at issue here constitutes a constructive amendment. On the contrary, he cites cases that *rejected* constructive-amendment claims even where there was a greater variance from the indictment than in this case. *See, e.g.*, *United States v. Khalupsy*, 5 F.4th 279, 293-94 (2d Cir. 2021) (no constructive amendment where trial proof allowed jury to convict on additional securities fraud scheme that was "not specifically pleaded in the indictment"); *Bastian*, 770 F.3d at 223 (no plain error where defendant's Section 924(c) conviction "involved a completely different type of gun, used on different dates for different purposes and in different criminal transactions" than alleged in indictment); *United States v. Patino*, 962 F.2d 263, 266 (2d Cir. 1992) (similar), *abrogated on other grounds by United States v. Capers*, 20 F.4th 105 (2d Cir. 2021). Thus, Rahmankulov can show, "[a]t most, [that] the district court failed to identify a novel legal issue that neither party brought to its attention, an omission that does not meet the standard of a plain error." *Bastian*, 770 F.3d at 224. Similarly, given the overwhelming evidence of guilt and the immateriality of this purported error to the result in this case, it in no way affected the "fairness, integrity or public

21

reputation of judicial proceedings." *Marcus*, 560 U.S. at 262.

### POINT II

### Rahmankulov Did Not Receive Ineffective Assistance of Counsel

Rahmankulov next argues that he received ineffective assistance of counsel at trial due to his attorney's remarks during closing argument and failure to object to the bank fraud jury instruction. (Br. 32-45). But Rahmankulov has failed to establish that his counsel's performance objectively fell below the constitutional minimum standard of competence guaranteed by the Sixth Amendment or that he suffered any prejudice as a result. In the alternative, if this Court has any concern that Rahmankulov may not have received effective assistance, it should defer the matter to be considered on a motion pursuant to 28 U.S.C. § 2255, which would permit the District Court to supplement the record as appropriate.

### A. Relevant Facts

Defense counsel gave a lengthy and vigorous closing argument. During summation, defense counsel argued several times that the Government had acted unethically by purportedly suborning perjury from its cooperating witnesses. (Tr. 1176-77, 1190, 1194, 1195, 1198, 1201). But defense counsel made many other arguments, drawing on themes he raised during various cross examinations.

22

First, defense counsel repeatedly encouraged the jury to "get out of that prosecution mode," to be "objective," and to consider whether there was "a reasonable non-criminal explanation for the facts." (Tr. 1177, 1179, 1197, 1209, 1210). For example, defense counsel claimed that Rahmankulov was expecting a payment for a truck and did not know that the person paying him used the proceeds of computer hacking to make the payment. (Tr. 1191-93, 1195-96). He sought to explain other transfers as legitimate payments for Rahmankulov's purported electronics business. (Tr. 1184, 1185-86, 1188, 1196-97). Moreover, defense counsel argued that it was not Rahmankulov's handwriting on various checks and thus that Rahmankulov did not knowingly participate in an unlicensed money transmitting scheme. (Tr. 1199-1201).

Second, defense counsel repeatedly argued that the Government's witnesses were untruthful and that the cooperating, immunized, and non-prosecution witnesses in particular had motives to lie, such as personal dislike for Rahmankulov or pressure to say what the Government wanted to hear. (Tr. 1179, 1180-84, 1187-88, 1189-90, 1202-06, 1209). Third, defense counsel emphasized that it was the Government's burden to prove Rahmankulov's guilt beyond a reasonable doubt. (Tr. 1177, 1178-79, 1197-98). Fourth, defense counsel claimed that there was insufficient corroborating evidence to support the testimony of various witnesses. (Tr. 1206-08). Finally, defense counsel highlighted Rahmankulov's efforts to help others in his immigrant community. (Tr. 1180, 1182-84).

23

The Government did not object to defense counsel's arguments regarding the ethics of the prosecutors, nor did the Government make any other objections during the defense summation. (*See* Tr. 1175-1210). After the defense summation, the District Court—*sua sponte*, without the jury present—criticized defense counsel for making baseless personal attacks on the prosecutors. (Tr. 1211-13). The parties consented to a curative instruction, which the District Court gave before the Government's rebuttal, stating:

> Folks, just to be clear, the government is not on trial here. Your sole job in this trial is to determine whether, on the evidence or lack of evidence, the defendant's guilt has been proven beyond a reasonable doubt.

(Tr. 1216).

In its rebuttal, the Government asked the jury to focus on the evidence and reminded the jury twice that "statements and questions of the lawyers are not evidence." (Tr. 1218, 1226, 1234-35). The Government responded to defense counsel's various arguments in summation. (Tr. 1218-34). The Government's only response to defense counsel's personal attacks on the prosecutors was to tell the jury that defense counsel was "distract[ing] your attention with a series of personal attacks that have no basis in your deliberations." (Tr. 1218). The Government did not address the issue again. To conclude rebuttal, the Government urged the jury to "decide this case without fear, without prejudice, without sympathy," "based on the evidence that you have seen and heard." (Tr. 1235).

24

The District Court instructed the jury multiple times throughout the trial that the jurors' duty was to determine the defendant's guilt or innocence based on the evidence alone and that the lawyers' arguments were not evidence. Specifically, at the start of trial, the District Court instructed the jury:

> It will be your duty to find from the evidence what the facts are. That's going to be your job in this trial. You, and you alone, are the judges of the facts. From the evidence presented at trial, you will decide what happened, you'll then have to apply those facts to the law as I'll give it to you. . . . The evidence from which you will find the facts will consist of the testimony of witnesses and documents, and other things received in evidence. . . .

(Tr. 36). The District Court further instructed the jury at the start of the trial that "statements, arguments, and questions of the lawyers are not evidence." (Tr. 37). Before summations, the District Court reiterated to the jury that "closing arguments are not evidence." (Tr. 1111).

Again during the jury charge, the District Court instructed that it was the jurors' "sworn duty" to be "judges of the facts" and "pass upon the evidence." (Tr. 1238-39). The District Court repeated: "Under your oath as jurors, you are not to be swayed by sympathy or prejudice. You are to be guided solely by the evidence in this case." (Tr. 1242). The District Court emphasized the jurors' obligation to decide the case based on the evidence alone:

> It is for you alone to decide whether the government has proven that the defendant is guilty solely on the basis of the evidence or lack of evidence and subject to the law as I explain it to you. It must be clear to you. Once you let fear or prejudice or bias or sympathy interfere with your thinking, there is a risk that you will not arrive at a true and just verdict.

(Tr. 1242; *see also* Tr. 1242-43, 1244, 1305, 1306 (repeated instructions to decide the case based on the evidence)). The District Court reminded the jury that "statements and arguments by lawyers are not evidence because the lawyers are not witnesses." (Tr. 1244). It further directed that "[t]he personality and the conduct of counsel are also not in any way at issue." (Tr. 1239). The District Court closed the jury charge with the order that the jurors' "verdict must be rendered without fear, without favor, without prejudice, or sympathy." (Tr. 1308-09).

## B. Applicable Law

### 1. Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel, a defendant must: (1) demonstrate that counsel's performance fell below an "objective standard of reasonableness" under "prevailing professional norms"; and (2) "affirmatively prove prejudice" from the alleged dereliction. *Strickland v. Washington*, 466 U.S. 668, 687-88, 693-94 (1984); *accord Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011). Only if both elements are satisfied can the defendant

26

demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. In raising such a claim, the defendant bears a "heavy burden." *United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004).

A reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, bearing in mind that there are countless ways to provide effective assistance in any given case and that even the best criminal defense attorneys would not defend a particular client in the same way." *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990). Courts must presume that "the lawyer is competent to provide the guiding hand that the defendant needs." *United States v. Cronic*, 466 U.S. 648, 658 (1984). Thus, a reviewing court begins with a presumption that the attorney "was conscious of his duties to his clients and that he sought conscientiously to discharge those duties" unless and until the defendant proves otherwise. *Id.* at 658 n.23.

"[E]very effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. The emphasis should not be on grading counsel's performance but on "whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696.

27

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690. This Court has "declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox or downright ill-advised." *Tippins v. Walker*, 77 F.3d 682, 686 (2d Cir. 1996).

Prejudice under the second prong requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "An ineffectiveness claim . . . is an attack on the fundamental fairness of the proceeding whose result is challenged." *Id.* at 697. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). "[N]ot every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Strickland*, 466 U.S. at 693.

## 2. Ineffective Assistance Claims on Direct Appeal

When a criminal defendant on direct appeal asserts that trial counsel provided ineffective assistance, this Court may: "(1) decline to hear the claim" and defer it to a subsequent motion pursuant to 28 U.S.C. § 2255; "(2) remand the claim to the district court for necessary factfinding"; or "(3) decide the claim on the [existing] record." *United States v. Morris*, 350 F.3d 32, 39 (2d Cir. 2003). Ordinarily, "a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance." *Massaro v. United States*,

28

538 U.S. 500, 504 (2003); *see also United States v. Khedr*, 343 F.3d 96, 99-100 (2d Cir. 2003). That is because "a trial record [is] not developed precisely for the object of litigating or preserving the [ineffective assistance] claim and [is] thus often incomplete or inadequate for this purpose." *Massaro*, 538 U.S. at 504-05. Indeed, there are numerous reasons why "few [ineffective assistance] claims will be capable of resolution on direct appeal":

> If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it. The appellate court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse. The trial record may contain no evidence of alleged errors of omission, much less the reasons underlying them . . . . In addition, the § 2255 motion often will be ruled upon by the same district judge who presided at trial. The judge, having observed the earlier trial, should have an advantageous perspective for determining the effectiveness of counsel's conduct and whether any deficiencies were prejudicial.

*Id.* at 505-07.

Where, however, the record is sufficiently developed on direct appeal, this Court can deny an ineffective assistance claim if its "resolution is beyond any

29

doubt or to do so would be in the interest of justice." *Khedr*, 343 F.3d at 100; *accord Gaskin*, 364 F.3d at 467-68 (denying ineffective assistance claim on direct appeal); *United States v. Fleurimont*, 401 F. App'x 580, 583 (2d Cir. 2010) (same); *United States v. De La Pava*, 268 F.3d 157, 163 (2d Cir. 2001) (same where claim was "straightforward" and "susceptible to resolution as a matter of law").

While an ineffectiveness claim can be denied on direct appeal, it should not—absent "highly unusual circumstances"—be granted without affording prior counsel an opportunity to explain his or her conduct. *Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998) ("We believe that a district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs."); *accord Cox v. Donnelly*, 387 F.3d 193, 201 (2d Cir. 2004); *Bloomer v. United States*, 162 F.3d 187, 194 (2d Cir. 1998).

## C. Discussion

### 1. Rahmankulov Has Failed to Demonstrate Ineffective Assistance in His Trial Counsel's Closing Argument

Rahmankulov's claim that he received ineffective assistance due to his counsel's summation is meritless. Rahmankulov cannot show that defense counsel's performance during summation was constitutionally deficient, nor can he affirmatively prove prejudice from counsel's remarks about the prosecutors.

30

First, defense counsel's summation—as a whole—did not fall below an objective standard of reasonableness. *See United States v. Hon*, 17 F.3d 21, 26-27 (2d Cir. 1994) (finding counsel not ineffective, where counsel's "comment was merely inarticulate" and his "argument as a whole was an effective one"). In summation, defense counsel raised numerous arguments that reiterated themes raised during cross-examination of Government witnesses. (*See, e.g.*, Tr. 1179, 1180-93, 1195-97, 1199-1209). It was a reasonable—indeed, necessary—defense strategy to vigorously attack the credibility of these witnesses because, if the jury credited the witnesses, there was no question as to Rahmankulov's guilt. To that end, Rahmankulov's trial counsel highlighted, among other things: (1) the witnesses' possible incentives to lie because of cooperation and non-prosecution agreements with the Government; (2) the witnesses' personal biases against Rahmankulov; and (3) prior examples of the witnesses' untrustworthiness. (Tr. 1179, 1180-84, 1187-88, 1189-90, 1202-06, 1209). Defense counsel further argued that the corroborating evidence was insufficient to support the testimony of the witnesses. (Tr. 1206-08). He also urged the jury to consider specific non-criminal explanations for the payments Rahmahkulov received and argued that Rahmahkulov did not know the criminal source of those payments. (Tr. 1184, 1185-86, 1188, 1191-93, 1195-97, 1199-1201). In addition, defense counsel reminded the jury throughout his summation that it was the Government's burden to prove Rahmankulov guilty beyond a reasonable doubt and that the jury should be "objective" and review the evidence

31

"out of that prosecution mode." (Tr. 1177, 1178-79, 1197-98, 1209, 1210).

Taken together, defense counsel's arguments in closing presented a robust defense—far exceeding "an objective standard of reasonableness" under "prevailing professional norms." *Strickland*, 466 U.S. at 687-88, 693-94. Counsel's baseless allegations that the prosecutors suborned perjury can be understood as part of a strategy to attack the credibility of the Government's cooperating witnesses. Even assuming those remarks were improper, they do not undermine the overall effectiveness of the defense summation. Likewise, even assuming Rahmankulov is correct that these remarks violated rules of professional conduct, that does not mean that counsel's performance fell below the *Strickland* standard. "Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are only guides" to determining whether counsel's assistance was reasonable. *Strickland*, 466 U.S. at 688. Defense counsel's summation, taken as a whole, fell well within the wide range of reasonable professional assistance. *See Hon*, 17 F.3d at 26-27; *Aguirre*, 912 F.2d at 560.

In addition, regardless of whether counsel's performance was deficient, Rahmankulov cannot "affirmatively prove prejudice," *Strickland*, 466 U.S. at 687-88, 693-94, because the evidence of his guilt was overwhelming, *see, e.g.*, *United States v. Guang*, 511 F.3d 110, 120 (2d Cir. 2007) (rejecting ineffective assistance claim because defendant failed to show prejudice where the evidence was overwhelming); *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) ("[e]ven serious

32

errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt"); *United States v. Reiter*, 897 F.2d 639, 645 (2d Cir. 1990) (despite "concededly questionable and unprofessional conduct" on the part of counsel, no prejudice was found because evidence of guilt was overwhelming). Six separate witnesses—including several who entered guilty pleas and testified pursuant to cooperation agreements—testified in detail about Rahmankulov's multiple money laundering schemes. (Tr. 159-210, 295-362, 461-512, 693-739, 787-844, 849-83). This testimony was corroborated by voluminous bank records and bank surveillance video showing that Rahmankulov accessed and controlled the laundered funds. (GX 3001, 3003, 3003-A, 3003-B, 3003-C, 3003-D). SBA records further showed that Rahmankulov submitted fraudulent loan applications to the SBA, including multiple applications that contradicted each other. (Tr. 442-48; GX 606-B, 2905-D, 2908). Moreover, bank account opening records and testimony from a bank investigator demonstrated that Rahmankulov lied to banks about his companies and the source of funds. (Tr. 270-74; GX 3001, 3005-A, 3005-B, 3005-C, 3005-D; 3801). And an immunized witness, who Rahmankulov had recruited into the scheme, testified that Rahmankulov instructed him to lie to law enforcement about a laundering payment and threatened him when he refused to do so—demonstrating Rahmankulov's consciousness of guilt. (Tr. 505-10).

Rahmankulov's argument that he was prejudiced by his counsel's accusations against the prosecutors in summation relies on multiple speculative leaps: that

33

defense counsel's allegations in fact inflamed the jury; that the allegations inflamed the jury to be prejudiced against Rahmankulov and not the prosecutors—the intended targets of the accusations; that the jurors were so prejudiced by the remarks that they set aside their duty to decide the case based on the evidence alone; and that, but for the remarks, Rahmankulov would have been acquitted. Rahmankulov's unfounded speculation is insufficient to demonstrate prejudice. *See United States v. Acevedo*, 229 F.3d 350, 357 (2d Cir. 2000) (finding ineffective assistance claim speculative where appellant failed to show what appropriate sentence would have been); *United States v. Weiss*, 930 F.2d 185, 199 (2d Cir. 1991) ("purely speculative" claims about the impact of counsel's alleged error did not establish prejudice). In sum, Rahmankulov cannot meet his burden of showing that the "likelihood of a different result" is "substantial, not just conceivable." *Harrington,* 562 U.S. at 112.

In claiming that he was prejudiced by counsel's remarks about the prosecutors, Rahmankulov exaggerates the role of those remarks in the summation. As noted above, counsel's attack on the prosecutors was one of many arguments in a lengthy summation. (*See* Tr. 1179, 1180-84, 1185-90, 1191-93, 1195-1208, 1209). The summation was not otherwise inflammatory and primarily made legitimate arguments discrediting the witnesses, offering non-criminal explanations of the facts, and emphasizing the Government's burden of proof. *Cf. Sales v. Harris*, 675 F.2d 532, 541-42 (2d Cir. 1982) ("While two of the prosecutor's remarks may have been considered somewhat inflammatory, the closing argument as a whole . . . did not deprive

34

appellant of a fair trial."). Nor did the Government or Judge Abrams draw significant attention to counsel's attacks on the prosecutors. The Government did not object during counsel's summation, and Judge Abrams did not interrupt it. (*See* 1175-1210). And in rebuttal, the Government minimized the import of counsel's attack on the prosecutors, responding only that defense counsel was "distract[ing] your attention with a series of personal attacks that have no basis in your deliberations." (Tr. 1218). Counsel's critique of the prosecutors therefore played a minor role in summations and cannot be assumed to have prejudiced Rahmankulov.

Rahmankulov's argument to the contrary further ignores the multiple instructions the jury received to decide the case based on the evidence alone. At the start of trial, before summations, and during the jury charge, Judge Abrams repeatedly instructed the jury to determine the verdict based on the evidence, "without fear, without favor, without prejudice, or sympathy." (Tr. 36, 1238-39, 1308-09). Likewise, at the start of trial, before summations, and during the jury charge, Judge Abrams told the jury that "statements, arguments, and questions of the lawyers are not evidence," and "closing arguments are not evidence." (Tr. 37, 1111, 1244). In addition, Judge Abrams informed the jury that "[t]he personality and the conduct of counsel are also not in any way at issue." (Tr. 1239). And in direct response to defense counsel's summation, Judge Abrams reminded the jury, with the consent of the parties, that:

> [T]he government is not on trial here.
> Your sole job in this trial is to determine

35

> whether, on the evidence or lack of evidence, the defendant's guilt has been proven beyond a reasonable doubt.

(Tr. 1216).

Rahmankulov presents nothing to overcome the presumption that the jurors followed Judge Abrams's repeated instructions to determine the defendant's guilt based on the evidence, without bias. *See, e.g.*, *Shannon v. United States*, 512 U.S. 573, 585 (1994) ("[T]he almost invariable assumption of the law [is] that jurors follow their instructions."); *United States v. Ferguson*, 676 F.3d 260, 292 (2d Cir. 2011) ("[J]uries are presumed to follow their instructions."). Rahmankulov thus cannot show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

Because Rahmankulov cannot show prejudice, "this court need not consider the objective reasonableness of counsel's actions." *United States v. Birkin,* 366 F.3d 95, 101 (2d Cir. 2004); *accord Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."). This Court can thus reject Rahmankulov's claim based on the prejudice prong alone. *See, e.g.*, *United States v. Ben Zvi*, 242 F.3d 89, 96-97 (2d Cir. 2001) (rejecting ineffective assistance claim where defendant failed to show prejudice). Alternatively, if the Court has any doubt that Rahmankulov received ineffective assistance, it should (at most) defer the matter to be

36

considered in a Section 2255 motion, permitting trial counsel an opportunity to explain himself. *See Massaro*, 538 U.S. at 504; *Khedr*, 343 F.3d at 99-100; *Sparman*, 154 F.3d at 52.

### 2. Rahmankulov Has Failed to Demonstrate Ineffective Assistance in His Trial Counsel's Decision Not to Challenge the Jury Instructions

Rahmankulov also recasts his constructive-amendment claim as an ineffective-assistance claim, but that argument fails under both *Strickland* prongs. Because (as explained above) the constructive-amendment claim is meritless, Rahmankulov's trial counsel was not ineffective in declining to raise it. And Rahmankulov cannot show that he was prejudiced by counsel's failure to challenge the jury instructions. If counsel had objected to the inclusion of the "scheme to defraud" instructions and the District Court had only instructed the jury on the "scheme to obtain money" prong of the bank-fraud statute, the trial's result would have been the same. As detailed above, the evidence at trial overwhelming showed that Rahmankulov made false statements to banks to obtain money in their custody. Rahmankulov therefore cannot demonstrate a reasonable probability that "the result of the proceeding would have been different" if his counsel had objected. *Strickland*, 466 U.S. at 694.

## POINT III

## The District Court Did Not Err in Determining the Loss Amount

Rahmankulov argues that the District Court procedurally erred at sentencing by incorrectly calculating the U.S. Sentencing Guidelines in two respects: (1) by including the losses caused by his co-conspirators in the loss amount; and (2) by relying on intended loss, rather than actual loss. (Br. 46-62). Neither contention has merit. Judge Abrams did not commit clear error in concluding that the losses caused by Rahmankulov's co-conspirators were foreseeable to him, and his challenge to the inclusion of intended loss is squarely foreclosed by this Court's precedent. In addition, the asserted errors are harmless given Judge Abrams's clear statement that she would have imposed the same sentence regardless of her ruling on the disputed Guidelines issues.

### A.   Relevant Facts

The Presentence Report calculated a Guidelines offense level of 37 and a criminal history category of I, resulting in a Guidelines range of 210 to 262 months' imprisonment. (PSR ¶¶ 92, 97, 141). In calculating the offense level, the Presentence Report determined the amount of funds laundered to include (1) the funds laundered by co-conspirator Fariddun Kuliev; (2) the funds laundered by co-conspirator Artur Sattarov, but only to the extent that Sattarov laundered funds for the same pharmacies as Rahmankulov; and (3) the intended loss amount from the computer hacking conspiracy—namely, the funds stolen from victims during

38

computer hacks that Rahmankulov and his co-conspirators were unable to withdraw because banks first froze the funds as suspicious. (PSR ¶¶ 62-63; Dkt. 232 at 17, 20). The inclusion of the co-conspirator funds increased the offense level by two, while the inclusion of intended losses did not affect the Guidelines range. (Dkt. 232 at 17, 20).

In his sentencing submission, Rahmankulov objected to the loss amount calculation on the basis that (1) he should not be held responsible for the loss amounts associated with his co-conspirators Sattarov and Kuliev; and (2) the intended loss should be excluded. (A. 84-90). The Government opposed those arguments in its sentencing submission. (Dkt. 232 at 17-20). At sentencing, Judge Abrams overruled Rahmankulov's objections and adopted the Guidelines calculation in the Presentence Report. (Sent. Tr. 6-8).

During the sentencing hearing, the Government emphasized several aggravating factors under 18 U.S.C. § 3553(a) that were unrelated to the loss amount, including Rahmankulov's participation in money laundering for multiple fraud schemes, his recruitment of others to the criminal schemes, his obstruction of justice, his transfer of crime proceeds to Uzbekistan (beyond the reach of the Government), and the harm to victims. (Sent. Tr. 12-18). The Government nevertheless argued for a below-Guidelines sentence of at least 120 months, consistent with the recommendation of the Probation Office. (Sent. Tr. 11; PSR at 27).

Defense counsel requested a sentence of less than ten years' imprisonment. (Sent. Tr. 29). He made

several arguments in favor of mitigation, including that (1) Rahmankulov was remorseful (Sent. Tr. 26-27, 30); (2) the Guidelines range was "unreasonable" because of the loss amount calculation (Sent. Tr. 27-29, 30); and (3) Rahmankulov has many children and is "a decent soul" (Sent. Tr. 29). Judge Abrams agreed with counsel's comments regarding the reasonableness of the Guidelines "in the fraud area." (Sent. Tr. 27). Rahmankulov told the District Court that he was "sorry" and that he "destroyed [his] life" and "the [lives] of [his] wife and [his] children." (Sent. Tr. 31).

Before imposing sentence, Judge Abrams thoroughly analyzed the Section 3553(a) factors, including the mitigating arguments made by defense counsel. (Sent. Tr. 31-38). Judge Abrams stated that the Guidelines range, driven by the loss amount, was "simply too high." (Sent. Tr. 36). She then imposed a below-Guidelines sentence of 121 months' imprisonment. (Sent. Tr. 38). "[B]ased on the facts before [her]," Judge Abrams explained, she "would have imposed this same sentence even if [she] had ruled differently on the guidelines calculations." (Sent. Tr. 38-39). She noted that the sentence she imposed was within the Guidelines range proposed by defense counsel. (Sent. Tr. 39). Ultimately, Judge Abrams concluded as follows:

> But even if those guidelines were wrong, this is an appropriate sentence, in my view, for Mr. Rahmankulov. Given all of his actions, he needed to spend more than ten years in prison. He needed that sentence, and I think that's appropriate.

(Sent. Tr. 39).

40

## B. Applicable Law

### 1. Standard of Review

Appellate review of a district court's sentence "encompasses two components: procedural review and substantive review." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*). In determining whether a sentence is reasonable, this Court applies a "'deferential abuse-of-discretion standard.'" *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)). "A district court commits procedural error where it fails to calculate the Guidelines range (unless omission of the calculation is justified), [or] makes a mistake in its Guidelines calculation." *Id.* at 190; *see also Gall*, 552 U.S. at 51.

This Court reviews a Guidelines interpretation question that was raised in the district court *de novo* and reviews factual determinations for clear error. *United States v. Cramer*, 777 F.3d 597, 601 (2d Cir. 2015). Even where the Court identifies a procedural error, including an error in calculating the applicable Guidelines, if "the record indicates clearly that the district court would have imposed the same sentence in any event, the error may be deemed harmless, avoiding the need to vacate the sentence and to remand the case for resentencing." *Id.*; *see United States v. Shuster*, 331 F.3d 294, 296 (2d Cir. 2003) ("[G]uideline disputes that would not have affected the ultimate sentence need not be adjudicated on appeal.").

41

## 2. Loss Amount

The amount of loss attributable to a defendant at sentencing includes losses resulting from all relevant conduct. *See* U.S.S.G. § 1B1.3(a). Under Section 1B1.3(a), relevant conduct includes:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction [or] in preparation for that offense[.]

U.S.S.G. § 1B1.3(a). As explained in the commentary to that section, "[i]n order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake," and must then include "[t]he conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant." U.S.S.G. § 1B1.3, cmt. n.3.

Consistent with that commentary, in *United States v. Studley*, this Court explained that "in order for a district court to sentence a defendant on the basis of criminal activity conducted by a coconspirator," the district court must, first, "make a particularized finding of the

42

scope of the criminal activity agreed upon by the defendant," and then, second, "make a particularized finding as to whether the activity was foreseeable to the defendant." 47 F.3d 569, 574-75 (2d Cir. 1995). To determine the scope of the defendant's agreement to engage in crime, "the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." U.S.S.G. § 1B1.3, cmt. n.3; *see also Studley*, 47 F. 3d at 575 ("The relevant inquiry is what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct.").

Under the Guidelines that were in effect at the time of Rahmankulov's sentencing, the commentary defined "loss" as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). This Court recently concluded that this definition of "loss" was "authoritative" because it was "neither inconsistent with nor a plainly erroneous reading of the guideline." *United States v. Rainford*, 110 F.4th 455, 475 (2d Cir. 2024).

## C. Discussion

### 1. Rahmankulov Was Appropriately Held Responsible for Money Laundered by Co-Conspirators

Judge Abrams appropriately included as relevant conduct for Rahmankulov the amounts laundered by co-defendants Sattarov and Kuliev. As to Sattarov—who laundered on a much greater scale than Rahmankulov and Kuliev—the loss amount included only the amounts Sattarov laundered for the same

43

pharmacies for which Rahmankulov laundered fraud proceeds. (PSR ¶¶ 62-63; Dkt. 232 at 17, 20).

Relying on the evidence at trial and other evidence in the record, Judge Abrams found that Rahmankulov, Sattarov, and Kuliev were engaged in jointly undertaken criminal activity. (Sent. Tr. 6-8). Judge Abrams found it "critical" that Sattarov, Kuliev, and Rahmankulov laundered funds for the same pharmacies during the same period in 2020 as "part of an ongoing scheme to launder the proceeds generated through fraudulent billing." (Sent. Tr. 7). She explained that, while Rahmankulov "may not have reached an explicit agreement to launder a particular amount of funds," Rahmankulov "created shell companies which operated as an ongoing vehicle for laundering in coordination with . . . his coconspirators who were laundering for the same pharmacies at the same time using the same method and sending the same proceeds to the same destinations." (Sent. Tr. 7-8).

As noted by Judge Abrams, the evidence showed close coordination between Rahmankulov's laundering and the laundering of Sattarov and Kuliev. For example, cooperating witness Sarah Sakhrani testified that, in 2020, Zafar Kabilov instructed her to receive checks in her business account and wire the funds to a company in China—the same company to which Sattarov and Rahmankulov had wired funds. (Tr. 705-06, 725-27, 804-05, 817, 829-31; GX 403, 1103-B, 1103-C, 3007, 3205-04, 3213-01). At the same time, Rahmankulov and Kuliev repeatedly deposited checks from their shell companies, which had received fraud proceeds from some of the same pharmacies, into Sakhrani's

44

business account, which Sakhrani then wired to the Chinese company at Kabilov's direction. (Tr. 722-26; GX 3001; PSR ¶ 61). Rahmankulov and Kuliev put the same false information on the memo line of their checks—the same false information that Kabilov and Sakhrani had discussed would be on the checks deposited into Sakhrani's account. (Tr. 710-15; GX 1103-E, 1103-F; PSR ¶ 61). Sattarov, Rahmankulov, and Kuliev thus worked in coordination for the same co-conspirator. And each of the launderers benefitted from the fact that multiple other individuals were engaged in the laundering conspiracy, using multiple shell companies and accounts, because it made the movement of criminal proceeds more difficult to detect and trace.

These facts were—as Judge Abrams correctly reasoned—akin to *United States v. Eisner*, 431 F. App'x 23 (2d Cir. 2011), in which this Court held that the defendant was responsible for his co-defendant's conduct because the defendant knew "the extent of the losses caused [by the] scheme . . . , was instrumental in its initial development, and continued to participate in and profit from the scheme throughout the time in which it was in existence." (Sent. Tr. 6-7 (citing *Eisner*, 431 F. App'x at 26)). Judge Abrams further found that the facts here are similar to the example of jointly undertaken criminal activity described in U.S.S.G. 1B1.3 cmt. n.4(c)(ii), in which multiple defendants worked together to design and execute a fraudulent scheme and each separately received proceeds of the scheme. (Sent. Tr. 7). Moreover, as Judge Abrams explained, this case is distinguishable from *Studley*, "where the defendant had no interest in the success of the

45

operation as a whole and took no steps to further the operation beyond executing his sales." (Sent. Tr. 8).

In short, consistent with this Court's precedent, because Rahmankulov and his co-conspirators engaged in jointly undertaken criminal activity, Judge Abrams did not clearly err by including the amounts laundered by Rahmankulov's co-conspirators as relevant conduct for Rahmankulov in calculating the loss amount.

### 2. The District Court Correctly Included Intended Loss in the Guidelines Calculation

Rahmankulov claims that the District Court committed procedural error by improperly relying on intended (as opposed to actual) loss in determining the loss amount under U.S.S.G. § 2B1.1. According to Rahmankulov, the use of intended loss is based solely on Guidelines commentary that is invalid after *Kisor v. Wilkie*, 588 U.S. 558 (2019) because it purportedly conflicts with the Guidelines text that it interprets. (Br. 59-63). But as Rahmankulov acknowledges, his argument is squarely foreclosed by this Court's precedent. (Br. 60).

In *United States v. Rainford*, this Court concluded that Application Note 3(A) to Section 2B1.1, which defined "loss" as "the greater of actual loss or intended loss," remained valid after *Kisor*. *See* 110 F.4th at 475. The Court determined that *Kisor* did not overrule *Stinson v. United States*, 508 U.S. 36 (1993), in which the Supreme Court held that Guidelines commentary is controlling unless it is directly inconsistent with the Guidelines text. *Rainford*, 110 F.4th at 475 & n.5.

46

Because the Guidelines did not themselves define "loss," this Court reasoned, the commentary's definition of "loss" as the greater of actual or intended loss did not contradict the Guidelines text and was thus authoritative. *Id.* This Court subsequently reiterated that holding in *United States v. Zheng. See* 113 F.4th 280, 299 (2d Cir. 2024) ("Zheng argues that 'loss' is not genuinely ambiguous, and unambiguously means actual loss. We recently rejected this proposition in *United States v. Rainford.*"); *cf. United States v. Pasternak*, No. 23-6316, 2024 WL 4763986, at *4 (2d Cir. Nov. 13, 2024) (adhering to *Stinson* in applying different commentary regarding loss amount, U.S.S.G. § 2B1.1 cmt. n.3(F)(v)(III)); *United States v. Smith*, No. 22-3104, 2024 WL 4404046, at *3 (2d Cir. Oct. 4, 2024) (adhering to *Stinson* in applying commentary to different Guidelines provision, U.S.S.G. § 4B1.2 cmt. n.4).

Here, Rahmankulov does not challenge the amount of the intended loss as adopted by the District Court, nor does he allege any other case-specific error as to loss amount. Rather, he challenges only the legal validity of Application Note 3(A) after *Kisor*. Rahmankulov's challenge is therefore squarely foreclosed by *Rainford* and *Zheng* and must be rejected. *See United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022) ("It is a longstanding rule that a panel of our Court is bound by the decisions of prior panels until such times as they are overruled either by an en banc panel of our Court or by the Supreme Court.").

47

### 3. Any Error in the Guidelines Calculation Was Harmless

Finally, even if the District Court had erred in determining the loss amount (and it did not), any purported error was harmless. At the close of an exhaustive, careful sentencing proceeding, Judge Abrams noted that, "based on the facts before [her], [she] would have imposed this same sentence even if [she] had ruled differently on the guidelines calculations." (Sent. Tr. 38-39). Judge Abrams thus clearly stated that the contested Guidelines issues did not affect Rahmankulov's sentence.

Instead, as Judge Abrams explained, Rahmankulov's sentence was driven by the Section 3553(a) factors. Judge Abrams explicitly considered, among other things, the seriousness of the offense, including that Rahmankulov participated in multiple schemes—"orchestrat[ing] a money laundering network and launder[ing] proceeds of computer hacking, healthcare fraud, [and] fraudulent SBA loans into personal and bogus bank accounts he controlled and created"—that he engaged in these crimes "[f]or years," and that "his motive for doing so was greed." (Sent. Tr. 32). Rahmankulov's victims were "real people whose lives were affected by this man's greed and lack of concern for others," Judge Abrams continued, and Rahmankulov "used money obtained from laundering to purchase cars, a house, and an apartment in his homeland." (Sent. Tr. 33). Judge Abrams also emphasized the need for deterrence, observing that "[n]othing deterred him from continuing to engage in this conduct and steal money that didn't belong to him" (Sent. Tr. 32),

48

and that "there remains a real concern of recidivism" because "I have very little doubt that he will engage in fraudulent activity if given the chance to do so" (Sent. Tr. 35). Judge Abrams found particularly aggravating that "Rahmankulov has no respect for this Court or the laws of this country," as demonstrated by him instructing a witness to lie, "feign[ing] amusement and arrogance" during that witness' testimony, and "brazenly" submitting "false documentation regarding his employment and letters of support in connection with sentencing from individuals that he doesn't even know and that did not author the letters that he submitted." (Sent. Tr. 33-34). Despite these aggravating factors, Judge Abrams concluded that the "[Guidelines] range here is simply too high" and that "calculations driven by loss amounts, as here, often border on the irrational and are frequently absurd." (Sent. Tr. 36). Ultimately, Judge Abrams imposed a substantially below-Guidelines sentence of 121 months' imprisonment, explaining that "even if those guidelines were wrong, this is an appropriate sentence" because, "[g]iven all of his actions, [Rahmankulov] needed to spend more than ten years in prison." (Sent. Tr. 39).

Because Rahmankulov's sentence would have remained the same, based on the Section 3553(a) factors, regardless of the applicable Guidelines range, any error in calculating the loss amount was harmless. *See United States v. Jass*, 569 F.3d 47, 68 (2d Cir. 2009); *United States v. Delarosa*, 675 F. App'x 91, 93 (2d Cir. 2017) ("Even assuming that the District Court committed procedural error in its Guidelines calculation, it is clear from the record that the Guidelines calculation did not affect the District Court's ultimate

49

imposition of sentence. Accordingly, any error was harmless . . . ."); *United States v. Komar*, 529 F. App'x 28, 29-30 (2d Cir. 2013) ("Even if we were to conclude otherwise, however, Komar would not be entitled to re-sentencing based on such Guidelines error because the district court made clear that it would have imposed the same sentence even if the applicable Guidelines range had been different."). Simply put, "the record indicates clearly that the district court would have imposed the same sentence in any event." *United States v. Kent*, 821 F.3d 362, 367-68 (2d Cir. 2016).

## CONCLUSION

### The judgment of conviction should be affirmed.

Dated:     New York, New York
             March 10, 2025

                         Respectfully submitted,

                         MATTHEW PODOLSKY,
                         *Acting United States Attorney for the*
                         *Southern District of New York,*
                         *Attorney for the United States*
                             *of America.*

NATHAN REHN,
CECILIA VOGEL,
JAMES LIGTENBERG,
      *Assistant United States Attorneys,*
             *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 11,418 words in this brief.

MATTHEW PODOLSKY,
*Acting United States Attorney for the*
*Southern District of New York*

By: JAMES LIGTENBERG,
*Assistant United States Attorney*